IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIONAL EMPLOYERS' ASSURANCE :    CIVIL ACTION
LEAGUES VOLUNTARY EMPLOYEES :
BENEFICIARY TRUST, ET AL. :
                           :
        v.            :
                           :
MICHAEL O'BRIEN, D.M.D., P.C.,:
ET AL.                      :    NO. 12-2207

**MEMORANDUM**

McLaughlin, J.                            November 14, 2013

       This case arises from a multiple-employer employee death benefit arrangement designed by John J. Koresko ("Koresko") called the Regional Employers' Assurance Leagues Voluntary Employees Beneficiary Trust ("REAL VEBA"). In the 1990s, Koresko marketed the REAL VEBA Plan to employers in Alabama, by conducting seminars in that state. Michael O'Brien ("O'Brien"), a resident of Alabama and owner of an Alabama-based dental practice (the "P.C."), attended one of Koresko's seminars in Opelika, Alabama. Following the seminar, the P.C. adopted the REAL VEBA employee welfare benefit plan and O'Brien enrolled as a participant.

       In 2012, O'Brien demanded termination of the plan and distribution of the life insurance policies from the plan. On March 28, 2012 the REAL VEBA, Single Employer Welfare Benefit Plan Trust ("SEWBPT"), and PennMont Benefit Services, Inc.

("PennMont") (collectively, "Plaintiffs") filed this action in the Court of Common Pleas of Montgomery County, seeking a declaratory judgment that the defendants are not entitled to any benefits or distributions from the plan. The defendants properly removed the action to this Court.

Defendants O'Brien and the P.C. have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.[1] The Court finds that O'Brien and the P.C. lack the requisite minimum contacts for personal jurisdiction and will therefore grant the motion.

I.   Factual History

The facts are drawn from the allegations in the complaint and documents that are incorporated into the complaint by reference or are integral to the plaintiffs' claims. Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Facts relevant to the Court's jurisdictional analysis are drawn from affidavits and other documentary evidence, as well as the

---

[1] Defendant South Insurance Consultants, Inc. originally joined in the motion to dismiss, but has since withdrawn its motion. 7/13/12 Withdrawal of Rule 12(b)(2) Mot. (Docket No. 15).

allegations in the complaint.  <u>Metcalfe v. Renaissance Marine,</u>

<u>Inc.</u>, 566 F.3d 324, 330-31 (3d Cir. 2009).


A.    <u>The Parties</u>

The Regional Employers' Assurance Leagues ("REAL") is

an unincorporated association of employers.  Employers who join

the REAL may adopt a benefit structure for their employees under

the REAL's welfare benefit plan, the REAL Voluntary Employees'

Beneficiary Association plan ("REAL VEBA Plan").  Assets of the

plan are held in the REAL VEBA Trust, which is organized under

the laws of and whose situs is in Pennsylvania.  PennMont, a

Pennsylvania corporation, is the plan administrator for the REAL

VEBA Plan.  Compl. ¶¶ 6-8, 19; 6/25/12 L. Koresko Decl. ¶¶ 2-3,

5, 10-30.

The P.C. is an Alabama dental practice that joined the

REAL in 1999.  Michael O'Brien is the owner of the P.C.  4/30/12

O'Brien Decl. ¶¶ 1, 7.


B.    <u>Koresko's Seminar</u>

During the late 1990s, John J. Koresko, who had

designed and created the REAL and the REAL VEBA Plan, traveled

the country conducting seminars at which he touted the benefits

3

of using voluntary employee benefit associations as estate and tax planning tools. The target audience for these seminars included business owners, accountants, and tax attorneys. At these speaking engagements, Koresko would encourage the attendees to enroll their companies in the REAL and participate in its welfare benefit structure. At least two of these seminars were held in Opelika, Alabama. 4/30/12 Ray Decl. ¶¶ 3-5.

O'Brien learned about the REAL VEBA Plan and Trust when he attended one of Koresko's Opelika, Alabama seminars in 1999. He did not have any prior contact with Koresko or anyone else associated with the REAL VEBA. 7/13/12 O'Brien Supp. Decl. ¶ 5.

At the seminar, Koresko explained the advantages of participating in a voluntary employee benefit association. Chief among them was the ability to claim a current deduction for contributions, while still permitting the beneficiary to receive a tax-free payment. 4/30/12 O'Brien Decl. ¶¶ 3-5. Koresko also stated that the REAL VEBA could be utilized in any state or country, leading O'Brien to believe that it would be a local employee benefit plan. Koresko did not reference any connection between the REAL VEBA Plan and the Commonwealth of

4

Pennsylvania. He did not mention that the REAL VEBA Trust or its trustee, First Union National Bank ("FUNB")[2], was located in Pennsylvania. Nor did he explain that PennMont, the plan administrator, was a Pennsylvania company. O'Brien was unaware that Koresko, himself, lived in Pennsylvania. 7/13/12 O'Brien Supp. Decl. ¶¶ 5-7.

C.  Defendants' Enrollment in the REAL VEBA Plan and Trust

After hearing Koresko speak, O'Brien decided to enroll his business, the P.C., in the REAL and establish an employee welfare benefit plan through the REAL VEBA Plan. On December 29, 1999, O'Brien, on behalf of the P.C., executed an Adoption Agreement, through which the P.C. formally joined the REAL, agreed to and adopted the REAL VEBA Plan, and consented to participation in the REAL VEBA Trust.[3] The Adoption Agreement

---

[2] FUNB has since been replaced as trustee by Penn Public Trust. 6/25/12 L. Koresko Decl. ¶ 4.

[3] The Adoption Agreement was signed by "Charles Michael O'Brien" on behalf of the P.C. PX 1 (REAL VEBA Health & Welfare Benefit Plan Adoption Agmt.). As it is undisputed that defendant Michael O'Brien is the individual who signed the documents for the P.C., it appears that "Charles Michael O'Brien" refers to him.

"PX" refers to the exhibits submitted by the plaintiffs along with their complaint.

5

also created the Michael O'Brien, D.M.D., P.C. Health and Welfare Benefit Plan (the "P.C. Plan"), an employee welfare benefit plan for the P.C.'s employees. Through the P.C. Plan, its eligible employees could enroll in the larger REAL VEBA Plan structure. O'Brien, as an eligible employee of the P.C., signed documents enrolling himself in the P.C. Plan and, by extension, the larger REAL VEBA Plan. PX 1; 4/30/12 O'Brien Decl. ¶ 7.

The Adoption Agreement lists PennMont as plan administrator for the P.C. Plan and FUNB as trustee of the REAL VEBA Trust. PX 1 ¶¶ 1, 11(b)-(c). Pursuant to the Adoption Agreement, FUNB, as trustee, would carry out an investment program at the direction of a three-person committee for the P.C. Plan.[4] FUNB would also have "discretion to choose the vendor of any investment vehicle or contract." Id. ¶¶ 9-10.

The Adoption Agreement incorporates a companion Master Trust Agreement and references various provisions of the REAL VEBA Plan Document, which is also incorporated as part of the Master Trust Agreement. These documents more fully outline the responsibilities and powers of the plan administrator and trustee for the REAL VEBA Trust. See PX 1; PX 2 (REAL VEBA Plan

---

[4] As of December 29, 1999, the committee was comprised of O'Brien, Koresko, and an unnamed third-party financial advisor. PX 1 ¶ 9(a).

6

Document); PX 3 (Amended and Restated REAL VEBA Master Trust Agmt.). However, O'Brien was not provided with a copy of the Master Trust Agreement or Plan Document to review at the time he executed the Adoption Agreement.[5] 7/13/12 O'Brien Supp. Decl. ¶¶ 14-15.

O'Brien signed the Adoption Agreement, employee participation agreement, and related documents in Auburn, Alabama. All of these documents were presented to him by Bryan Ray, an insurance agent with defendant Southern Insurance, an Alabama-based insurance company. O'Brien did not negotiate or discuss his and the P.C.'s participation in the REAL VEBA arrangement with Koresko or anyone else affiliated with the Pennsylvania entities involved in operation of the REAL VEBA Trust and Plan. None of the documents that O'Brien signed referenced the Pennsylvania location of the REAL, the REAL VEBA Trust, FUNB, or PennMont. 7/13/12 O'Brien Decl. ¶¶ 12; see PX 1-3.

The usual procedure for an employee's enrollment in the REAL VEBA's benefit structure is as follows. After an

_____

[5] It is unclear when O'Brien finally received copies of the Master Trust Agreement and the Plan Document. From his supplemental declaration, it appears that he saw those documents only in connection with the instant litigation. See 7/13/12 O'Brien Supp. Decl. ¶¶ 14-15.

employer joins the REAL VEBA, any interested eligible employee partially completes an application for life insurance with a local insurance carrier. The applicant does not fill out the applicant/owner or beneficiary sections of the application form. The applicant's local insurance broker then mails the form to PennMont in Pennsylvania, and PennMont forwards the application to the REAL VEBA trustee for its signature as sole beneficiary. 6/25/12 L. Koresko Decl. ¶¶ 15-8, 28 & Ex. A (Processing the REAL VEBA Ins. Application).

The REAL VEBA trustee then returns the countersigned application to PennMont, at which point PennMont sends the completed application to the local insurance carrier who can issue the policy. The local issuer then determines the applicant's eligibility for the policy and notifies PennMont and the applicant if and when the applicant is approved. Once that occurs, the employee participant or his employer sends premium payments, payable to the REAL VEBA trustee, to PennMont in Pennsylvania. That money is deposited into the REAL VEBA Trust. The REAL VEBA trustee then pays the premium on the life insurance policy directly to the local policy issuer. 6/25/12 L. Koresko Decl. ¶¶ 20-23, 28 & Ex. A (Processing the REAL VEBA Ins. Application).

The typical process was apparently followed with respect to O'Brien's application. In early 2000, O'Brien submitted an application through Southern Insurance for a life insurance policy from Western Reserve Life Assurance Co. of Ohio ("Western Reserve"). O'Brien completed the portions he was required to sign at Southern Insurance's Opelika, Alabama office, leaving blank the applicant/owner segment of the form.[6] 4/30/12 Ray Decl. ¶¶ 2, 6; 7/13/12 O'Brien Supp. Decl. ¶ 16; DX 1 (Western Reserve Life Ins. Policy Application). Once the form was completed, Southern Insurance mailed the application to PennMont in King of Prussia, Pennsylvania.[7] DX 1 (Western Reserve Life Ins. Policy Application).

---

[6] O'Brien wrote in the "Primary Beneficiary" section of the application, "Same as Owner (See Section 3)," the section that lists the applicant/owner if other than the proposed primary insured. O'Brien did not fill in any information in that section. DX 1.

[7] In an initial declaration submitted with the defendants' motion to dismiss, an insurance agent with Southern Insurance claimed that Southern Insurance sent the application to Western Reserve. 4/30/12 Ray Decl. ¶ 6. The application reflects that it was, in fact, sent to PennMont rather than Western Reserve.

The plaintiffs contend that the policy application was made on a Pennsylvania insurance application form. There is nothing on the face of the application reflecting that the applied-for policy would be issued in Pennsylvania or governed by that commonwealth's laws.

Western Reserve eventually approved O'Brien and issued a life insurance policy on his life, naming FUNB as the beneficiary. 4/30/12 Ray Decl. ¶ 6. After O'Brien was approved, the P.C. paid the annual premiums on his policy to PennMont.[8] 6/25/12 L. Koresko Decl. ¶ 35. The P.C. paid the premiums between 1999 and 2003, but has not since paid any of the premiums on the policy. 7/13/12 O'Brien Supp. Decl. ¶ 21.

Since the P.C. joined the REAL VEBA, it has received annual invoices for administrative fees and census survey forms from PennMont, which were mailed from Pennsylvania. O'Brien has paid the invoices and responded to the census requests through mailings back to PennMont in Pennsylvania. In all, O'Brien, on behalf of the P.C., has remitted thirteen or fourteen fee payments to PennMont. Southern Insurance and the P.C.'s accountants have also engaged in telephone and written communications with PennMont, soliciting information regarding the status of O'Brien's policy and its cash value. PennMont has "consistently taken the position that the P.C. is not entitled

---

[8] O'Brien contends that the P.C. only ever made these payments to Western Reserve in Iowa. 7/13/12 O'Brien Supp. Decl. ¶ 21. Lawrence Koresko's declaration maintains, however, that the P.C. actually submitted payments directly to PennMont. 6/25/12 L. Koresko Decl. ¶ 35.

10

to any information about the [REAL VEBA] Plan." 7/13/12 O'Brien
Supp. Decl. ¶¶ 22-23.

###### D.     REAL VEBA Plan Document Amendment

The REAL VEBA Plan is governed by a Plan Document.  At
the time O'Brien executed the Adoption Agreement and his
employee participation agreement, the Plan Document stated that
"this Plan shall be construed, administered and governed under
the laws of the state in which the Employer's principal office
is located."  The Plan Document defined "Employer" as "the
Employer adopting this Plan."  PX 2 §§ 1.04, 10.05.  In this
case, the "Employer" was the P.C. and the state in which its
principal office is located is Alabama.

On July 29, 2009, PennMont unilaterally amended the
REAL VEBA Plan Document to vest itself and the REAL VEBA trustee
with authority to make "Protective Filing[s]" in "a court of the
Commonwealth of Pennsylvania . . . involving any matter arising
under the Plan and Trust."  PX 5 (7/29/09 Amendment of Trust and
Incorporated Plan Documents).  It did so in reliance on Article
9 of the Plan Document.  Section 9.03(b) grants "[t]he League .
. . the right to amend this Plan, in its sole discretion."  PX
2.

11

E.    Request to Terminate the Plan

In 2012, the defendants requested that PennMont terminate the P.C. Plan and sought to extricate O'Brien's policy from the REAL VEBA Plan.  Id. ¶ 70.  The plaintiffs contend that the defendants' demands are prohibited by the terms of the Plan Document, and filed the instant suit for declaratory judgment and breach of contract.

II.  Analysis

O'Brien and the P.C. have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2), arguing that the Court lacks personal jurisdiction over them. Once a defendant raises objections to a court's assertion of personal jurisdiction, the plaintiff bears the burden of proving, through competent evidence, sufficient contacts with the forum state to establish personal jurisdiction.  Metcalfe, 566 F.3d at 330-31; BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000).  Disputed facts are construed in favor of the plaintiff.  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002).

A. Personal Jurisdiction Standard

Federal Rule of Civil Procedure 4(k) states that a federal court sitting in diversity exercises personal jurisdiction over non-resident defendants to the extent permissible under the laws of the court's forum state.  Fed. R. Civ. P. 4(k)(1)(A); Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007).  Pursuant to statute, Pennsylvania courts may exercise personal jurisdiction to the extent permissible under the Due Process Clause of the Fourteenth Amendment.  42 Pa. Cons. Stat. § 5322; Marten, 499 F.3d at 296.

The defendants argue, and the plaintiffs do not dispute, that they lack the "systematic and continuous contacts" with Pennsylvania necessary to subject them to general personal jurisdiction in this forum.  See Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300 (3d Cir. 2008) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 & n.9 (1984)). The parties dispute, rather, whether the defendants' contacts with Pennsylvania are sufficient to create specific personal jurisdiction.

The Due Process Clause permits a forum state's courts to exercise specific personal jurisdiction over non-resident defendants where a two-prong standard is satisfied.  First, the

13

defendant must have "minimum contacts" with the forum. Vetrotex
Certainteed Corp. v. Cons. Fiber Glass Prods. Co., 75 F.3d 147,
150 (3d Cir. 1996) (quoting Burger King Corp. v. Rudzewicz, 471
U.S. 462, 474 (1985)). Second, where "minimum contacts" are
established, the court's assertion of jurisdiction must also
"comport with 'traditional notions of fair play and substantial
justice.'" Vetrotex Certainteed, 75 F.3d at 150-51 (quoting
Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

    The minimum contacts test is met where the defendant
has "'purposefully directed [its] activities' at the forum" and
the litigation arises out of or relates to those activities.
D'Jamoos v. Pilatus Aircraft Ltd., 566 F.3d 94, 102-03 (3d Cir.
2009) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462 472
(1985)) (alteration in the original). This case turns on the
first component, "[t]he threshold requirement" that the
defendant purposefully aimed activities at Pennsylvania. Id. at
103.

    Defendants need not enter a forum to be subject to
personal jurisdiction there. Grand Entm't Grp., Ltd. v. Star
Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993). Their
contacts must amount to "a deliberate targeting of the forum,"
however. O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312,

317 (3d Cir. 2007). Mail, telephone, and electronic communications sent into the forum can help establish the necessary minimum contacts. Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150-51 (3d Cir. 2001); Grand Entm't Grp., 988 F.2d at 482.

At bottom, the minimum contacts standard requires the defendant to have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State" such that it "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (quotation marks and citation omitted); Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001).

Both the Supreme Court and the Court of Appeals for the Third Circuit have elaborated on the particular minimum contacts analysis to be used in cases arising from the breach of an agreement between parties. A defendant's contract with an in-forum plaintiff does not, standing alone, establish sufficient jurisdictional contacts. Burger King, 471 U.S. at 478; BP Chems., 229 F.3d at 261. A non-resident defendant purposefully avails himself of conducting activities in the forum by "reach[ing] out" and creating "continuing relationships and obligations" with citizens of the forum. General Elec., 270

15

F.3d at 150 (quoting Burger King, 471 U.S. at 473). The Third Circuit has directed courts to "inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." Id. at 150.

Courts must consider "the place and character prior negotiations, contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in order to determine whether a defendant had minimum contacts with the forum, Burger King, 471 U.S. at 479, and must look at the "totality of the circumstances." Remick, 238 F.3d at 256.

### B.  Application

#### 1.  Minimum Contacts

As a threshold matter, it is relevant whether the defendants had reason to know that they were dealing with Pennsylvania citizens. See Nautilus Ins. Co. v. Green Eye Tech., LLC, 2012 WL 5451808 at *6 (E.D. Pa. Nov. 8, 2012) (finding that whether a defendant is actually aware of the plaintiff's citizenship "significantly bears upon all aspects of the purposeful availment analysis"). What is necessary for purposeful availment is a "deliberate targeting" of the forum. O'Connor, 496 F.3d at 317; Time Share Vacation Club, 735 F.2d at

65-66 ("What is required . . . is actual evidence that, by entering into the contract, the particular defendant could foresee impact with Pennsylvania."). A defendant does not deliberately target Pennsylvania solely by contracting with a resident of Pennsylvania. See Burger King, 471 U.S. at 478. The unilateral activity of a Pennsylvania citizen, or contacts with a Pennsylvania citizen that occurs outside of the state, are also insufficient for purposeful contact with the state. O'Connor, 496 F.3d at 317.

Here, O'Brien and the P.C. did not deliberately target or reach out to Pennsylvania in order to form the contract at issue. During the contract formation stage, O'Brien was never aware that Koresko, the REAL VEBA, or PennMont were located in Pennsylvania. During his presentation, Koresko stated that the REAL VEBA could be adopted in any state or country. Koresko's representation led O'Brien to believe that the REAL VEBA was a locally based plan. Even if that conclusion was unreasonable, based on the record before the Court, O'Brien had no reason to discern that the REAL VEBA was a Pennsylvania-based plan. Koresko never mentioned any connection between the REAL VEBA and Pennsylvania. He did not mention that the REAL VEBA Trust was a Pennsylvania trust; that PennMont, the plan administrator, was

17

located in Pennsylvania; or that the trustee was located in Pennsylvania. Koresko did not even inform O'Brien that he lived in Pennsylvania.

The place and character of the contract negotiations also indicate a lack of deliberate targeting of the forum. Though it is not necessary to the personal jurisdiction analysis that the defendant enter the forum state in order to negotiate a contract, Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1225 (3d Cir. 1992), "'the fact that the buyer negotiates the contract while visiting the forum state or makes a substantial number of telephone calls or mailings into the forum during the negotiation stage . . . is relevant to assessing whether the buyer has purposely availed itself of the opportunity of conducting activities in the forum.'" Nautilus Ins. Co., 2012 WL 5451808 at *7 (quoting Strick Corp. v. A.J.F. Warehouse Distributors, Inc., 532 F. Supp. 951, 959 (E.D. Pa. 1982)). The nature of the contract negotiations is also relevant in determining whether the defendants' contacts with the state are purposeful. Strick, 532 F. Supp. at 959. Minimum contacts can be based on the defendant's initiation of the deal, alteration of the contract terms, or significant negotiations. Id.

Here, the entire course of conduct leading to the defendants' decision to enroll in the REAL VEBA structure took place in Alabama. O'Brien heard about the REAL VEBA at a seminar that Koresko conducted in Opelika, Alabama. In deciding to enroll himself and his business in the REAL VEBA, O'Brien did not travel to Pennsylvania or communicate with individuals or entities within the Commonwealth. For that matter, O'Brien did not even meet or speak with any Pennsylvania resident or entity during the enrollment process. He only met with an Alabama-based insurance agent, Bryan Ray, who presented him with the necessary enrollment documents. O'Brien executed the Adoption Agreement on behalf of the P.C. and an employee participation agreement in his individual capacity at his offices in Auburn, Alabama. O'Brien and the P.C. did not send any of these documents into Pennsylvania in order to enroll in the plan.[9] O'Brien also was not required to and did not fill out the

---

[9] Southern Insurance agent, Bryan Ray, accepted O'Brien's enrollment documents. Though Ray may have sent some documents into Pennsylvania, the plaintiffs did not argue that Ray's actions should be attributed to O'Brien and the P.C. or that an agency relationship existed. To the contrary, Ray seems to have had an established relationship with Koresko and experience promoting the REAL VEBA Plan. 5/28/02 Ray Depo. 16 ¶¶ 6-11, 12 ¶¶ 11-21, 29 ¶¶ 8-16, 34 ¶¶ 17-24.

portions of the application naming the REAL VEBA trustee as sole beneficiary.

The character of the contract negotiations also indicates a lack of targeting of the forum. O'Brien was not an active participant in the negotiation of the agreement. O'Brien filled out only portions of the forms given to him. There is no evidence that O'Brien proposed terms to the agreement or negotiated at all with the Pennsylvania plaintiffs. O'Brien and the P.C. made no telephone calls or mailings into Pennsylvania in order to negotiate or discuss the terms of the agreement.

In this regard, O'Brien was similar to a "passive buyer" in the contract negotiations. In Vetrotex Certainteed, the Third Circuit held that there was no personal jurisdiction over a California defendant who was only a "passive buyer" of a Pennsylvania plaintiff's product. 75 F.3d 147 (3d Cir. 1995). The case involved a contract between a Pennsylvania company, Vetrotex, and a California citizen. Id. at 148-49. The non-resident defendant did not seek out an agreement with Vetrotex. Id. at 151. Vetrotex solicited the defendant to buy Vetrotex's products, and negotiated the contract via telephone and by personal visits to California. Id. at 152. The agreement was prepared by the plaintiff and sent to the defendant in

20

California, where it was executed.  Id.  The defendant then sent the signed agreement back to Vetrotex in Pennsylvania.  Id.

Based on the nature of those contract negotiations, the Third Circuit characterized the defendant as a "passive buyer" who did not purposefully avail itself of the privilege of doing business in Pennsylvania.  Id.  The Court distinguished the case from others in which personal jurisdiction was based largely on a contract with a Pennsylvania entity.  The Court noted that this was not a case in which the defendant "solicited the contract or initiated the business relationship leading up to the contract[,] . . . sent any payments to the plaintiff in the forum state, . . . or engaged in extensive post-sale contacts with the plaintiff in the forum state."  Id. at 152-53 (internal citations omitted).

Here, O'Brien and the P.C. were passive participants in the enrollment process.  They did not actively reach out to or solicit the REAL VEBA Trust.  Rather, they passively enrolled after hearing Koresko promote the plan at a seminar in Alabama.  O'Brien did not negotiate any terms to the contract, and merely filled out the small portions of the documents given to him, as instructed.  He did not have extensive pre- or post-enrollment contacts with any Pennsylvania party.  Instead, O'Brien was

21

repeatedly told that he was not entitled to any information about the REAL VEBA Plan.

Similarly, O'Brien was unlike the defendant in Mellon Bank, a case on which the plaintiff's rely. In that case, the Third Circuit found that the defendants had purposefully availed themselves of Pennsylvania's jurisdiction because they "were all well aware, or should have been, that they were dealing with a Pennsylvania bank." Mellon Bank, 960 F.2d at 1223. The loan documents that the defendants had signed stated that the bank providing the loans was a Pennsylvania entity and that payments should be sent to the bank's Philadelphia address; the underlying loan notes stated that they had been delivered in Pennsylvania; and the defendants had submitted financial documents, first through their broker and then directly to the bank in Philadelphia, to obtain financing and then an extension on the due date of their payments. Id. at 1220, 1223. The court also noted that the defendants had "negotiated and corresponded with Mellon in Pennsylvania." Id. at 1223.

The facts here are unlike those in Mellon Bank. Again, O'Brien did not know that the plaintiffs were located in Pennsylvania. Nothing in the documents indicated a connection to Pennsylvania. The contract negotiations took place in

Alabama, and no communications were sent by O'Brien or the P.C.
to Pennsylvania in furtherance of the enrollment. While O'Brien
did seek out Koresko in the sense that he attended the seminar
in Alabama, it was Koresko who was soliciting the business of
Alabama employers. O'Brien did not reach out to Koresko,
PennMont, or the REAL VEBA Trust specifically in order to
initiate a business relationship.

The terms of the contract are also instructive as to
whether or not a non-resident defendant deliberately targeted
the forum. "For example, where the contract indicates that it
is to be substantially performed in the forum, that the law of
the forum will control any disputes arising from the agreement,
or that payment is directed to the forum, it is reasonable to
assume that the buyer could anticipate being required to defend
a suit in the forum." Strick, 532 F. Supp. at 959.

Here, nothing in the contract or documents given to
O'Brien indicates any connection with Pennsylvania. The
documents did not contain the addresses for PennMont as
administrator, FUNB as trustee, or the REAL VEBA Trust itself.
O'Brien never received a copy of the Trust Agreement, which
states the REAL VEBA Trust's place of incorporation, or the Plan
Document, which, in any event, does not even mention that the

23

plan is administered in Pennsylvania. Although the plaintiffs contend that a Pennsylvania insurance application was used, there is nothing on the face of the application denoting that it would be sent to or was in any way affiliated with Pennsylvania.

The Adoption Agreement also stated that it would be construed, administered, and governed under the laws of the State of Alabama. This provision did not give O'Brien any indication that Pennsylvania law might apply or that a dispute may be filed in a Pennsylvania court. Instead, it indicated to O'Brien that this would be a locally-based plan and that a dispute would be handled by an Alabama court.

The July 29, 2009 amendment to the Plan Document, executed by PennMont, which gave PennMont the power to file a protective filing "in a court of the Commonwealth of Pennsylvania" does not help to establish minimum contacts. PX 5 § 10.25. In Solis v. Koresko, the Court already concluded that PennMont lacked authority to issue this amendment. There were multiple reasons why the Court reached that conclusion, some of which are not relevant to the facts of this case. One reason has bearing here, though.

The whereas clause of the amendment states that Article 9 of the Plan grants the plan administrator authority to

amend the Plan and Trust. Section 9.03(b) of the Plan Document, the provision in Article 9 that governs amendments, states that "*[t]he League* shall have the right to amend this Plan, in its sole discretion." Although not a defined term in the Plan Document, it is elsewhere used in that document to refer to the REAL (the unincorporated association of employers), not the plan administrator. Accordingly, because the purported July 29, 2009 amendment was signed by PennMont, the plan administrator, and not the REAL, the Court deemed it to be invalid. Solis, 884 F. Supp. 2d 261, 280 (E.D. Pa. 2012).

The defendants' contemplated future consequences and actual course of dealing gives some support for a finding of personal jurisdiction, though not to a sufficient extent to give this Court jurisdiction over O'Brien and the P.C. On one hand, O'Brien and the P.C. were aware that they were entering into a long-term contractual relationship. Both O'Brien and the P.C. would remain participants in the REAL VEBA Plan until, to the extent possible, they decided to extricate themselves or, in O'Brien's case, he died. The fact remains, however, that the defendants were unaware that the Trust would be located in Pennsylvania and they had no indication that the agreement established any ties with this forum.

Also, the defendants did send some post-enrollment communications and payments into Pennsylvania, but the Court finds them insufficient to establish minimum contacts, in light of the totality of the circumstances. The defendants admit that they mailed responses to census requests and annual invoices into Pennsylvania. These communications totaled 13-14 responses over the course of twelve years. The census documents do not establish minimum contacts, as they are merely "informational communications." See Remick, 238 F.3d at 256 ("[I]nformational communications in furtherance of a contract between a resident and a nonresident [do] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the nonresident.")(internal quotation omitted).

The Third Circuit has found that payments sent to the forum are relevant to the minimum contacts analysis, however. See Vetrotex, 75 F.3d at 151-52; North Penn Gas v. Corning Natural Gas, 897 F.2d 687, 690 (3d Cir. 1990). But, courts have found the mailing of payments into a forum selected unilaterally by the plaintiff insufficient for purposeful availment. See, e.g., Time Share Vacation Club, 735 F.2d at 66 n.7; Cintron Beverage Grp., LLP v. Aoun, 2011 WL 3156584 at *3 (E.D. Pa. July 26, 2011); ANR, Inc. v. Rothner, 2007 WL 712539 at *4 (E.D. Pa.

Mar. 6, 2007)(citing Mellon Bank, 960 F.2d at 1225); HAB Air,
Inc. v. Butler Aviation Corp., 1992 WL 10497 at *3 (E.D. Pa.
Jan. 21, 1992).

Here, the evidence, viewed in the light most favorable
to the plaintiffs, demonstrates that, between 1999 and 2003, the
P.C. paid annual premium payments to PennMont in Pennsylvania.
Taken together with the payments made in response to invoices
from PennMont, O'Brien and the P.C. made between 5 and 18
payments into Pennsylvania.

Nonetheless, the Court finds these few communications
with Pennsylvania insufficient to find that the defendants
purposefully availed themselves of the jurisdiction of this
Court. The plaintiffs have not satisfied their burden of
establishing that O'Brien and the P.C. have minimum contacts
with Pennsylvania. The defendants did not reach out into
Pennsylvania to establish an ongoing business relationship with
the plaintiffs. The plaintiffs did not disclose that they were
citizens of Pennsylvania, and the defendants therefore could not
foresee consequences in this state. The defendants were also
led to believe that the contract would be governed by local
laws, so they did not foresee being haled into this Court.
Though O'Brien and the P.C. did send a few informational

communications and payments to Pennsylvania, these are not sufficient contacts with the forum for this Court to have specific personal jurisdiction. The Court therefore finds that, in view of the totality of the circumstances, the Court lacks personal jurisdiction over defendants O'Brien and the P.C.

An appropriate order will issue separately.

**ENTERED**

NOV 1 5 2013

CLERK OF COURT